UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 09-50099-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND |
| vs. | ) | RECOMMENDATION |
| | ) | |
| JASON L. LITTLE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INTRODUCTION

This matter is before the court on a pending indictment against

defendant Jason L. Little charging him with being an unlawful user of a

controlled substance in possession of a firearm, in violation of 18 U.S.C.

§§ 922(g)(3) and 924(a)(2), and with possession of a firearm with an obliterated

serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B). Mr. Little

moves to suppress the evidence obtained following a stop of the vehicle he was

driving on September 16, 2009. See Docket No. 20. The government resists

this motion. Docket No. 23. This motion was referred to this magistrate judge

for a report and recommendation pursuant to the June 11, 2007, standing

order of Chief United States District Judge Karen E. Schreier and 28 U.S.C.

§ 636(b)(1)(B).

**FACTS**

An evidentiary hearing was held on Mr. Little's motion on February 2, 2010.  Present at the hearing were Mr. Little, his counsel, Mr. John R. Murphy, and the government's counsel, Assistant United States Attorney Mark Vargo.  Testimony was received from Officer Josh Twedt of the Rapid City Police Department.  Two exhibits were received:  a video recording of the traffic stop (Exhibit 1), and a photograph of the vehicle Mr. Little was driving at the time of the stop (Exhibit 2).  From Officer Twedt's testimony and documentary evidence presented at the hearing, the court makes the following findings of fact.

Officer Josh Twedt has been a police officer with the Rapid City Police Department for a little over two years.  No evidence of any other law enforcement experience on Officer Twedt's behalf was introduced.  On September 16, 2009, shortly after 4:00 in the afternoon, Officer Twedt was on duty and parked at the intersection of South Highway 79 and Old Folsom Road.  Officer Twedt's patrol vehicle was parked on the shoulder of Old Folsom Road on the east side of Highway 79, facing west.  Across Highway 79 from Officer Twedt was the Rapid City landfill.  This location is on the outskirts of the municipality of Rapid City, which is located to the north of where Officer Twedt was parked.

At this location, Highway 79 is a divided highway.  There are two north-bound lanes and two south-bound lanes.  The two directions of traffic are separated from each other by a concrete median consisting of a curb that is

approximately 8 to 10 inches high and tapers to a point before ending at the intersection of Old Folsom Road and Highway 79 to enable traffic to turn off of and onto the highway. At its widest point, the raised concrete median dividing traffic on Highway 79 is several yards wide.

Shortly after 4:00 p.m. on September 16, 2009, approximately 200 yards to the north from Officer Twedt's location, another Rapid City police officer, Officer Jason LaHaie, had made a traffic stop on Highway 79. Officer LaHaie and the vehicle he had stopped were parked on the right-hand shoulder of the northbound lanes of Highway 79. Officer LaHaie had activated his amber emergency lights during his traffic stop.

The video entered into evidence depicts a sunny, clear day in autumn with excellent visibility. See Exhibit 1. South-bound traffic is well-spaced, but steady. However, northbound traffic is decidedly sparse. In the first 41 seconds of the tape, nine vehicles pass by Officer Twedt's location traveling south on Highway 79. A tenth south-bound vehicle on Highway 79, a white van, pulls into the left turn turnout lane and rolls to a stop. Given the fact that the video was shot within an hour of school dismissing for the day and close to the end of the workday for many people, the exodus from the city of Rapid City to points south makes sense. A full 41 seconds of the tape plays, however, before the first north-bound vehicle is observed. A second northbound vehicle, a pick-up truck pulling a small trailer, follows four seconds after the first

3

vehicle. Mr. Little's vehicle, a white sport utility vehicle also traveling north, then comes into view two to three seconds after the second vehicle. Both Mr. Little's SUV and the pick-up truck he was following were in the right-hand lane when they passed by Officer Twedt at the intersection of Highway 79 and Old Folsom Road. After Mr. Little's vehicle passes, the white van that had been waiting to turn left makes its turn onto Old Folsom Road.

Immediately after passing through the intersection, both the pick-up truck pulling the small trailer and Mr. Little's vehicle moved from the right lane of travel to the left-hand lane of travel. Within two seconds of Mr. Little's SUV driving past, Officer Twedt's vehicle begins to pull out to follow Mr. Little with his emergency lights and siren activated. Officer Twedt testified, though it is not visible on the video, that Mr. Little failed to use his turn signal when moving from the right-hand to the left-hand lane of traffic. No testimony was elicited at the hearing as to whether the pick-up truck in front of Mr. Little had used a turn signal when its driver moved from the right-hand to the left-hand lane.

When Officer Twedt's vehicle pulls onto Highway 79 to follow Mr. Little's vehicle, there is a long unbroken stretch of open highway between the officer and Mr. Little that stretches for some distance. Officer Twedt testified that there were no vehicles traveling anywhere near the rear of Mr. Little's vehicle or to the side. Once Officer Twedt began following Mr. Little, Mr. Little moved

from the left-hand lane to the right-hand lane and used his electronic turn signal indicator when doing so. Officer Twedt testified that the sole reason he effected a stop of Mr. Little was Mr. Little's failure to use his turn signal when switching from the right to the left lane.

When asked to articulate his understanding of South Dakota's turn signal law, Officer Twedt testified that he understood that the law required that no turn be made unless it could be safely made and that the driver must signal his turn if there is other traffic in the immediate vicinity of the driver's vehicle. Officer Twedt further testified that he believed there were four vehicles affected by Mr. Little's lane change: (1) Officer LaHaie at the other traffic stop 200 yards away, (2) the white van in the south-bound left-turn lane of Highway 79 that was waiting to turn onto Old Folsom Road, (3) the pick-up truck pulling the trailer in front of Mr. Little, and (4) the other vehicles in the south-bound lanes of Highway 79.

Mr. Little moves to suppress the fruits of the search of his vehicle that followed Officer Twedt's traffic stop, arguing that there was no valid basis for the stop. The government resists this motion, arguing that Mr. Little did violate the turn signal law or, alternatively, that the stop is justified because of Officer Twedt's erroneous but reasonable belief that Mr. Little had violated the law.

# DISCUSSION

## A.    Whether Mr. Little Violated South Dakota Law

Mr. Little argues that Officer Twedt had neither a reasonable, articulable suspicion that criminal activity was afoot when he pulled Mr. Little's vehicle over, nor did Officer Twedt have probable cause to make that traffic stop.  The basis for Mr. Little's argument lies in interpretation of two South Dakota state statutes and the facts presented by his particular traffic stop.

When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a seizure under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief."  Brendlin v. California, 551 U.S. 249, 255-56 (2007); Delaware v. Prouse, 440 U.S. 648, 653 (1979); United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001).  A stop of the driver of a vehicle results in a seizure under the Fourth Amendment of all occupants of the vehicle.  Brendlin, 551 U.S. at 255-56.

A traffic stop is legal under the Fourth Amendment if it is supported by probable cause to believe that a violation of law has occurred.  Whren v. United States, 517 U.S. 806, 810 (1996).  "An officer has probable cause to conduct a traffic stop when he observes even a minor traffic violation. 'This is true even if a valid traffic stop is a pretext for other investigation.'"  United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (quoting United States v. Coney, 456 F.3d 850, 855-856 (8th Cir. 2006) (quoting United States v. Linkous, 285 F.3d 716,

719 (8th Cir. 2002)).  A traffic stop "is valid even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot." United States v. Long, 532 F.3d 791, 795 (8th Cir. 2008) (quoting United States v. Chatman, 119 F.3d 1335, 1339-1340 (8th Cir. 1997)).  An officer's subjective motivations are irrelevant to the probable cause determination.  Id.

A traffic stop under the Fourth Amendment can also be justified by a lesser showing of a "reasonable suspicion" pursuant to Terry v. Ohio, 392 U.S. 1 (1968).  United States v. Winters, 491 F.3d 918, 921 (8th Cir. 2007).  An officer making a Terry stop "must be able to articulate something more than an 'incohate and unparticularized suspicion or "hunch." ' " United States v. Sokolow, 490 U.S. 1, 7 (1989).  The Fourth Amendment requires "some minimal level of objective justification" for making the stop.  INS v. Delgado, 466 U.S. 210, 217 (1984).  The Court has held that probable cause means " 'a fair probability that contraband or evidence of a crime will be found,' and the level of suspicion required for a Terry stop is obviously less demanding than for probable cause."  Sokolow, 490 U.S. at 7 (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)).  "Police must have a 'particularized and objective basis' for suspecting criminal activity at the time the stop is made."  United States v. Spotts, 275 F.3d 714, 718 (8th Cir.2002).

"Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability.  Both

factors–quantity and quality–are considered in the 'totality of the circumstances–the whole picture,' that must be taken into account when evaluating whether there is reasonable suspicion." <u>Alabama v. White</u>, 496 U.S. 325, 330 (1990) (quoting <u>United States v. Cortez</u>, 449 U.S. 411, 417 (1981)). If the investigatory stop is not supported by reasonable suspicion or if the officers exceed the proper scope of the stop, then any evidence derived from the stop must be excluded from trial. <u>Wong Sun v. United States</u>, 371 U.S. 471, 484 (1963); <u>United States v. Wheat</u>, 278 F.3d 722, 726 (8th Cir. 2001).

Officer Twedt's stated basis for stopping Mr. Little's vehicle was that Mr. Little switched from the right-hand lane of travel to the left-hand lane of travel without a proper hand, mechanical, or electrical signal being made to telegraph that lane change. Officer Twedt testified that he believed this failure by Mr. Little was a violation of South Dakota's traffic laws. Officer Twedt articulated no other hunch, suspicion, or other basis for the stop. Therefore, since the stated basis for Officer Twedt's seizure of Mr. Little was a traffic violation, the appropriate standard to apply to this stop is probable cause.[1]

South Dakota law requires that the "driver of any vehicle upon a highway[,] before . . . turning from a direct line shall first see that such movement can be made in safety . . . and *whenever the operation of any other*

_____

[1] In any case, this court's conclusion as described *infra* would be the same if the applicable standard were the reasonable suspicion standard. Aside from the failure to use a turn signal, Officer Twedt voiced no other reason for the stop of Mr. Little's vehicle.

*vehicle may be affected by such movement* shall give a signal as required in

§ 32-26-23 plainly visible to the driver of such other vehicle of the intention to

make such movement." See SDCL § 32-26-22 (emphasis supplied).[2]  Under

South Dakota's so-called "move over" law, if an emergency vehicle is stopped on

the side of the road and is flashing amber or yellow warning lights, an

approaching driver on a highway with two or more lanes of traffic traveling in

the same direction must merge into the lane farthest from the emergency

vehicle and proceed with caution.  See SDCL § 32-31-6.1.[3]

---

[2]The entirety of § 32-26-22 provides as follows:

> The driver of any vehicle upon a highway before starting, stopping, or turning from a direct line shall first see that such movement can be made in safety and if any pedestrian may be affected by such movement shall give a clearly audible signal by sounding the horn, and whenever the operation of any other vehicle may be affected by such movement shall give a signal as required in § 32-26-23 plainly visible to the driver of such other vehicle of the intention to make such movement.  A violation of this section is a Class 2 misdemeanor.

See SDCL § 32-26-22.

   The court notes that Mr. Little never argues that his lane change was not a turn "from a direct line" as contemplated by the statute.  Therefore, the court assumes, for purposes of this opinion, that Mr. Little's lane change was such a turn.  Other courts have concluded that a lane change is a turn from a direct line as contemplated by similar turn-signal statutes.  See, e.g. Sass v. Thomas, 370 S.E.2d 73, 75-76 (N.C. App. 1988).

[3]The "move over" law provides as follows in its entirety:

> Upon approaching from any direction any stopped authorized emergency vehicle making use of red visual signals meeting the requirements of this title, the driver of every other vehicle shall

Reading these two statutes together, Mr. Little argues that, under the circumstances of the day as they presented themselves, he was not required to use a turn signal when he switched from the right-hand to the left-hand lane of traffic on Highway 79. He argues that the use of a turn signal is required only if there is another vehicle that may be affected by his movement, that there was no other such vehicle, and that the emergency vehicles at the other traffic stop were not "other affected vehicles" because the drivers of those vehicles would necessarily know that Mr. Little would be switching lanes pursuant to the "move over" law.

---

come to a complete stop before reaching the stopped emergency vehicle and may, unless otherwise directed, proceed with caution only after ascertaining that it is safe to do so, and upon approaching from any direction any stopped vehicle making use of amber or yellow warning lights, the driver of every other vehicle shall:

    (1). If driving on an interstate highway or other highway with two or more lanes traveling in the same direction as the vehicle, merge into the lane farthest from the vehicle and proceed with caution, unless otherwise directed; or

    (2). If driving on a two lane highway, slow to a speed that is at least twenty miles per hour less than the posted speed limit or five miles per hour when the speed limit is posted at twenty miles per hour or less and proceed with caution, unless otherwise directed.

A violation of this section is a Class 2 misdemeanor.

See SDCL § 32-31-6.1.

Mr. Little relies on <u>State v. Eidahl</u> as authority for his position. In that case, the defendant was driving on a city street (which no party disputed qualified as a "highway" within the meaning of the statute), when a police officer who was following approximately 1/4 of a block behind her stopped her for making first a right turn and then a left turn without using her turn signal. <u>State v. Eidahl</u>, 495 N.W.2d 91, 91-92 (S.D. 1993). She was found, subsequent to the traffic stop, to be under the influence of alcohol and was charged accordingly. <u>Id.</u> The circuit court dismissed the criminal information against Ms. Eidahl, holding that a city ordinance, which required the use of a turn signal *at all times,* was in conflict with SDCL § 32-26-22, which only required a turn signal if there were other affected vehicles. <u>Id.</u> at 93. The circuit court also had held that "there were insufficient facts showing that the Defendant should have utilized a turn signal in the operation of her vehicle" under the state statute. <u>Id.</u> at 93.

On appeal, the Supreme Court of South Dakota affirmed the circuit court's decision that the city ordinance was invalid because it conflicted with the state statute. <u>Id.</u> at 94. However, the opinion is devoid of any ruling as to whether the circuit court erred in its determination that there were insufficient facts from which to conclude that a turn signal was not necessary under the facts of this case. <u>See</u> <u>id.</u> at 91-94. Instead, the only other argument addressed by the court in its opinion was whether the state had waived its

argument that the officer had a "good faith" basis for the traffic stop.  Id. at 93-
94 (holding that the state had waived its "good faith" argument on appeal by
failing to raise it before the circuit court).  Therefore, the court finds that the
holding of Eidahl does not conclusively resolve the issue in this case–i.e.
whether Mr. Little was required to use his turn signal when switching lanes.

There are many states that have traffic regulations that are similar, if not
identical, to SDCL § 32-26-22.  In reviewing decisions from states having
similar statutes, it is clear that whether there was any other traffic in the
vicinity that could potentially be "affected" by a driver's decision to turn is a
factual question, not a legal question, and one that is highly dependent on the
facts adduced at the hearing.

In a Tennesee case, the court found that its state turn-signal law, which
is almost identical to SDCL § 32-26-22, had not been violated and, thus, did
not give rise to probable cause to support a traffic stop.  Tennessee v. Gonzalez,
52 S.W.3d 90, 98-99 (Tenn. Crim. App. 2000).  The facts in that case were that
the defendant turned without signaling in a residential area late at night, that
there was no traffic directly behind or around his vehicle, and that the police
officer's vehicle that was following him was far enough behind not to have been
affected by the defendant's turn.  Id.  The officer testified at the suppression
hearing that he was not affected by the defendant's turn.  Id.

In <u>Hall v. Texas</u>, 488 S.W.2d 788, 789 (Tex. Crim. App. 1973), an officer's traffic stop of a defendant for failure to signal a left turn was held not to provide justification for the stop. The facts showed that there were no approaching vehicles at the time the defendant turned and that the defendant's turn "didn't interfere with" the police officer. <u>Id.</u>

Likewise, in <u>Florida v. Riley</u>, 638 So. 2d 507 (Fla. 1994), the Florida Supreme Court held that a traffic stop was invalid where the basis for the stop was the driver's failure to signal before making a right-hand turn onto a highway. <u>Id.</u> at 507-08. The facts in that case showed that the officer never cited the driver after he was stopped, but only issued a warning ticket. <u>Id.</u> at 508. Furthermore, the officers testified that no other vehicle was affected by the driver's turn. <u>Id.</u>

In a case, like this one, involving travel on a multi-lane divided highway, the Superior Court of New Jersey, Appellate Division, found that a defendant's failure to signal did not provide police officers with justification for the subsequent traffic stop. <u>See</u> <u>New Jersey v. Williamson</u>, 637 A.2d 195, 195-97 (N.J. Super. 1994). The facts in that case demonstrated that the defendant was driving on a divided interstate highway with three lanes of traffic going in each direction. <u>Id.</u> at 195-96. A police officer "observed defendant's vehicle several car lengths ahead, in the center lane of the highway," and the "defendant moved his vehicle into the right lane without signaling." <u>Id.</u> There

13

were no vehicles in the vicinity except the police officer's vehicle.  Id. at 196.

See also Tennessee v. Smith, 21 S.W.3d 251, 256-57 (Tenn. Crim. App. 1999)

(holding that defendant's unsignaled lane change on a four-lane divided

highway in order to pass another vehicle with no other vehicles around was not

a violation of law because there was no other traffic nearby which was affected

by the lane change).

An intermediate California appeals court, on the other hand, held that a

driver's failure to signal a turn did affect other traffic.  See California v.

Behrens, 2009 WL 1766729, at **1-3 (Cal. App. June 23, 2009).  In that case,

the defendant was in a left-turn only lane controlled by a left-turn traffic light.

Id.  The defendant argued that her subsequent stop by police officers for failure

to signal was without probable cause or reasonable suspicion because she "had

no choice but to turn," and therefore, her failure to signal did not affect other

traffic.  Id.  The appellate court affirmed the trial court's finding of fact that the

defendant's turn *did* affect other traffic.  Id.  Specifically, the appellate court

credited the trial court's finding that the failure to signal took place on a Friday

afternoon, that there was heavily congested traffic, and that the freeway onto

which the defendant turned was packed with traffic that was moving extremely

fast.  Id.

The Behrens court specifically rejected the defendant's argument that

she was required to turn by the lane markings and traffic lights.  Id.  The court

noted that "[d]rivers do not always obey lane markings and traffic lights." Id. at *3.

In contrast to the Behrens decision, a Georgia court faced with a similar argument from a defendant in a left-turn only lane controlled by a left-turn traffic light held that the officer "could not reasonably maintain that he was unaware of [the defendant's] intention to turn" when the only legal option open to the defendant was to turn left. See Georgia v. Goodman, 469 S.E.2d 327, 327-29 (Ct. App. Ga. 1996). The Goodman court held that the defendant's failure to signal his left turn under these circumstances did not provide a reasonable, articulable suspicion for the subsequent traffic stop. Id.[4] The distinguishing factor between Behrens and Goodman appears to be that, in the Georgia case, there was no other traffic in the vicinity other than the police officer's vehicle. Id.

In a case revealing much more about the frustrations of driving in New York City than the law, the Court of Appeals of New York held that the defendant's failure to signal *did* affect other traffic and, thus, justified the stop. See New York v. Lyons, 163 N.E.2d 321, 321-22 (N.Y. 1959). The facts showed that the defendant was turning from one street into another at a "very busy,"

---

[4]The Goodman court also rejected the government's contention that the officer had reasonable suspicion to conduct the traffic stop because drunken drivers often fail to signal their turns. Goodman, 469 S.E.2d at 329-30. The court held that "it was not reasonable to conclude, based solely on Goodman's failure to signal, that he was intoxicated," where there was no other evidence of impaired driving. Id.

"very dangerous" intersection controlled by "no fewer than six three-phase traffic lights." Id. at 321. The police officer could see for a distance of 700 feet in the direction of defendant's car and observed automobiles traveling behind defendant in the same direction. Id. Defendant then turned left, with the result that the cars behind him caught up to him in less than 20 seconds. Id. The defendant conceded that there was other traffic around and that he had had to slow to allow on-coming traffic to pass before he could make his left-hand turn. Id. This, the court declared, was "precisely the kind of heedless driving with which the statute deals." Id. The defendant's conviction for the turn-signal violation was affirmed.

Applying the above case law to the facts of this case, the court concludes that Mr. Little did not violate South Dakota's turn signal law by failing to use a hand or mechanical signal when moving from the right-hand lane to the left-hand lane. There were no vehicles anywhere close behind him or beside him. Thus, these vehicles were not "affected" by his turn.

The court rejects Officer Twedt's suggestion that the white van waiting to turn was affected by Mr. Little's lane change. According to Officer Twedt's uncontradicted testimony, Mr. Little was in the right-hand lane when he passed through the intersection where the white van was stopped. Again, according to the officer's uncontradicted testimony, Mr. Little effected his lane change *after* passing through the intersection. Therefore, the white van's

course of action and planned travel path was not affected in any way by Mr. Little's lane change because Mr. Little's lane change took place some distance *behind* the white van and in the opposite direction the van was traveling. In any case, whether Mr. Little was in the right lane, the left lane, or in the progress of moving from one lane to the other at the intersection, the white van would have had to wait for both lanes to clear before making its turn onto Old Folsom Road. The white van was not "affected" by Mr. Little's turn.

The court similarly rejects Officer Twedt's suggestion that the second police officer, Officer LaHaie, at the traffic stop 200 yards up the road was "affected" by Mr. Little's lane change. Officer LaHaie and the vehicle he had stopped were parked. They were not moving in traffic. Furthermore, they were off the highway on the shoulder. Finally, they were approximately 200 yards from Mr. Little when Mr. Little changed lanes. Hence, the movement of other cars which were on the highway could not have affected Officer LaHaie and the driver he stopped, whether those other cars were changing lanes or not. Also, the court notes that Officer LaHaie's car and the vehicle he had stopped were both facing north and Mr. Little's lane change took place *behind* them to the south. In all likelihood, neither Officer LaHaie nor the driver of the car he stopped were even looking behind them in Mr. Little's direction at the time he made his lane change and were almost certainly unaware of that lane change altogether.

The court rejects out of hand Officer Twedt's suggestion that south-bound traffic on Highway 79 was "affected" by Mr. Little's lane change. That south-bound traffic was separated physically from Mr. Little's north-bound SUV by a concrete median several yards wide and 8 to 10 inches high. The speed limit at this location on Highway 79 was 55 miles per hour. Barring a maneuver which attempted to "jump" that concrete median by Mr. Little, very little he could do on his side of the highway would "affect" travel of vehicles on the other side of the highway. Running into an 8 or 10 inch concrete barrier at 55 miles per hour would not be advisable. Perhaps if Mr. Little were making a left turn off of the highway and the highway were not divided, there might be a chance that oncoming traffic would be "affected" by his turn. Such were not the facts in this case.

This brings us, finally, to Officer Twedt's suggestion that the pick-up truck in front of Mr. Little was "affected" by Mr. Little's lane change. Presumably, the driver of the pick-up truck moved from the right-hand to the left-hand lane for the same reason Mr. Little did–he observed a traffic stop in progress with amber emergency lights 200 yards down the road ahead of him. The driver of the pick-up truck never hit his brakes, never swerved, and never altered from his course of travel in any way in response to Mr. Little's lane change. Mr. Little was following the pick-up at an adequate distance behind

the pick-up.  There is simply no evidence that the pick-up was "affected" by Mr. Little's lane change.

Had the pick-up truck ahead of Mr. Little stayed in the right-hand lane while Mr. Little moved over to the left-hand lane, there is the possibility that the pick-up would have been "affected" by Mr. Little's lane change, particularly if Mr. Little was in the process of overtaking the pick-up.  The pick-up would need to move to the left lane because of the police car stopped up ahead, and Mr. Little's move to the left lane *before* the pick-up truck had moved over would require the driver of the pick-up truck to take account of Mr. Little's actions before he moved over.  However, such was not the case here.  In this case, the pick-up truck moved over first or in tandem with Mr. Little's move.  Thus, the fact that Mr. Little followed the movements of the pick-up truck rather than being the first to move eliminates the possibility that the pick-up truck was "affected" by Mr. Little's lane change.

This case is much more like <u>Goodman</u>, <u>Smith</u>, and <u>Williamson</u> than it is like <u>Lyons</u> or <u>Behrens</u>.  The traffic, such as it was, was sparse.  There was very little traffic moving north.  The majority of the traffic was south-bound and separated from the north-bound lanes of travel by a formidable concrete barrier.  The most likely position for a vehicle to be in that would be "affected" by Mr. Little's lane change would be either directly behind Mr. Little or in the left-hand lane next to him or slightly behind him.  There were no vehicles in

any of those locations. The only vehicle near Mr. Little was in front of him and showed no signs of being "affected" by Mr. Little's lane change. Furthermore, because Mr. Little's lane change did not take place in the intersection or immediately before he passed the white van waiting to turn, Mr. Little's lane change had no affect whatsoever on the white van.

The court concludes that Mr. Little did not violate South Dakota's turn signal law. No signal was required by Mr. Little under these circumstances because no other traffic was "affected" by Mr. Little's lane change.

In reaching this conclusion, the court rejects Mr. Little's argument that no turn signal was required by operation of South Dakota's "move over" law. If the facts of this case had been different–i.e. if there had been a vehicle in close proximity to the rear or to the left of Mr. Little's SUV, the law would require him to use his turn signal indicator before moving over to the left-hand lane. That is because there would be other vehicles "affected" by his lane change. Mr. Little and other drivers in his situation cannot rely on the fact that other drivers will anticipate his move over by operation of the law. As the Behrens court observed, drivers do not always obey the law.

**B.      Whether the Traffic Stop Was Justified by a Reasonable Mistake of Law**

Anticipating that the court might reach the conclusion described above, the government argues that Officer Twedt's mistake of law was reasonable and, thus, justifies the traffic stop. There are two types of errors a police officer

might make when effecting a traffic stop: a mistake of fact and a mistake of

law. As to the former, as long as the mistake of fact is objectively reasonable

under the circumstances and the officer proceeded in good faith, the mistake

will not doom the legality of the traffic stop. United States v. Payne, 534 F.3d

948, 951 (8th Cir. 2008).

However, as to mistakes of law, the federal circuits are nearly unanimous

that such mistakes render the traffic stop illegal under the Fourth Amendment.

United States v. Pena-Montes, 589 F.3d 1048, 1054 (10th Cir. 2009); United

States v. Gross, 550 F.3d 578, 584 n.2 (6th Cir. 2008); United States v. Coplin,

463 F.3d 96, 101 (1st Cir. 2006), cert. denied, 549 U.S. 1237 (2007); United

States v. McDonald, 453 F.3d 958, 961-62 (7th Cir. 2006); United States v.

Chanthasouxat, 342 F.3d 1271, 1279 (11th Cir. 2003); United States v. Lopez-

Soto, 205 F.3d 1101, 1105 (9th Cir. 2000); United States v. Miller, 146 F.3d

274, 278 (5th Cir. 1998).[5] These courts have articulated much well-reasoned

rationale for the rule.

" 'An officer's reasonable mistake of fact, as distinguished from a mistake

of law, may support the probable cause or reasonable suspicion necessary to

justify a traffic stop.' An officer's 'failure to understand the plain and

---

[5] The Fourth Circuit appears not to have decided the issue. See United
States v. McHugh, 2009 WL 3634278, * 3, n.3 (4th Cir. Nov. 4, 2009)("For
purposes of our discussion, we assume, without deciding, that an officer's
reasonable mistake of law may not provide the objective grounds for reasonable
suspicion to justify a traffic stop." ).

unambiguous law he is charged with enforcing, however, is not objectively reasonable.' " Pena-Montes, 589 F.3d at 1054 (quoting United States v. DeGasso, 369 F.3d 1139, 1144 (10th Cir. 2004)).

Also, defendants and other lay persons are often charged with knowledge of the law, whether they in fact know the law or not.  It is all the more appropriate to charge police, whose job is to enforce the law, with the same knowledge.  United States v. Orduna-Martinez, 561 F.3d 1134, 1137 n.2 (10th Cir. 2009) (citing United States v. Hodson, 77 U.S. (10 Wall.) 395, 409 (1870) ("Everyone is presumed to know the law," and stating that "if a defendant is presumed to know the law, we must expect as much from law enforcement."); United States v. Tibbetts, 396 F.3d 1132, 1138 (10th Cir. 2005) (citing DeGasso, 369 F.3d at 1144, and stating that " 'failure to understand the law by the very person charged with enforcing it is *not* objectively reasonable.' ").

It has also been pointed out that an officer's belief that a law violation has occurred cannot be reasonable when the acts in question are not prohibited by law.  McDonald, 453 F.3d at 961.  This is because "failure to understand the law by the very person charged with enforcing it is not objectively reasonable." Tibbetts, 396 F.3d at 1138.

Finally, courts have pointed out that "[t]he rule articulated by the Supreme Court in Whren provides law enforcement officers broad leeway to conduct searches and seizures regardless of whether their subjective intent

corresponds to the legal justifications for their actions. But the flip side of that leeway is that the legal justification must be objectively grounded." <u>Miller</u>, 146 F.3d at 279 (citing <u>Whren v. United States</u>, 517 U.S. 806, 812-14 (1996)).

Despite the fact that "[t]he vast majority of our sister circuits to decide this issue have concluded that an officer's mistake of law, even if made in good faith, cannot provide grounds for reasonable suspicion or probable cause, because an officer's mistake of law can never be objectively reasonable," <u>see</u> <u>Gross</u>, 550 F.3d at 584 n.2, the Eighth Circuit has held otherwise. <u>See e.g.</u> <u>United States v. Martin</u>, 411 F.3d 998, 1001 (8th Cir. 2005).[6] Eighth Circuit precedent is controlling here.

Although the Eighth Circuit will not invalidate a traffic stop due to an officer's mistake of law, it is clear that even the Eighth Circuit will not overlook all mistakes. "[S]ubjective good faith is not sufficient to justify the stop, for officers have an obligation to understand the laws that they are entrusted with

_____

[6]The Third Circuit and the District of Columbia Circuit appear to endorse variations on the Eighth Circuit's theme. <u>See United States v. Southerland</u>, 486 F.3d 1355 (D.C. Cir. 2007) (a stop is lawful despite a mistake of law, however, if an objectively valid basis for the stop nonetheless exists."); and <u>United States v. Delfin-Colina</u>, 464 F.3d 392, 398-400 (3d Cir. 2006) (holding that mistake of law will not invalidate a traffic stop if the officer can show "(1) identify the ordinance or statute that he believed had been violated and (2) provide specific, articulable facts that support an objective determination of whether any officer could have possessed reasbonable suspicion of the alleged infraction. As long as both prongs are met, an officer's sujective understanding of the law at issue woul dnot be relevant to the court's determination.").

enforcing, at least to a level that is objectively reasonable. Any mistake of law that results in a search or seizure, therefore, must be *objectively* reasonable to avoid running afoul of the Fourth Amendment." United States v. Martin, 411 F.3d 998, 1001 (8th Cir. 2005) (emphasis in orginal).

The Eighth Circuit addressed a mistake of law argument in a turn signal case based on an Iowa law identical to the South Dakota law at issue here. See United States v. Rodriguez-Lopez, 444 F.3d 1020 (8th Cir. 2006). In that case, an Iowa sheriff's office had set up a fake traffic checkpoint, placing signs on Interstate 80 that read, "Narcotics Enforcement Ahead," "Police Drug Dogs in Use," and "Be Prepared to Stop Ahead." Id. at 1021. In fact, there was no such checkpoint. Id. Instead, the signs were placed immediately before an interstate exit and a sheriff's deputy was placed at the exit in an unmarked car to look for any vehicles that exited in response to the signs about the checkpoint and to look for traffic infractions. Id.

The defendant took the exit, with a gravel truck following closely behind him. Id. The defendant stopped at a stop sign and then made a turn, but did not use his turn signal. Id. at 1021-22. A traffic stop was then made on defendant's vehicle on the basis of his failure to signal his turn. Id.

The defendant argued that the traffic stop violated the Fourth Amendment because he had not violated Iowa turn signal law since no other vehicle was "affected" by his turn. Id. at 1022. The Eighth Circuit avoided the

question of whether the defendant had in fact violated the Iowa turn signal law, noting that the Iowa statute and cases interpreting it did "not define what distance or condition renders a vehicle 'affected.'" Id. Instead, noting that the defendant's vehicle was followed directly behind by the gravel truck, the Eighth Circuit held that the sheriff's deputy could reasonably have believed that the gravel truck was a vehicle "affected" by the defendant's turn and therefore sustained the validity of the traffic stop. Id. at 1023.

Here, unlike the facts of the Rodriguez-Lopez case, there were no vehicles directly behind Mr. Little when he turned without signaling. Nor were there any vehicles beside him or in any location save directly in front of him. Furthermore, the lone vehicle that was near him, the pick-up truck directly in front of Mr. Little, performed the same exact lane change as Mr. Little at the same time as Mr. Little in response to the same stimuli (i.e. seeing the police car stopped up ahead with amber lights flashing). The driver of the pick-up truck made no adjustments to his speed or direction of travel in response to Mr. Little's lane change.

Under these circumstances, the court concludes that Officer Twedt's belief that Mr. Little had violated the law was simply not objectively

reasonable.[7]  For that reason, the court concludes that the traffic stop of

Mr. Little's vehicle was not supported by either probable cause or reasonable

suspicion.  Accordingly, the court concludes that the traffic stop violated the

Fourth Amendment.

## C.      Whether the Exclusionary Rule Should Apply

Concluding that Officer Twedt's traffic stop of Mr. Little was unlawful

does not end the inquiry, however.  Another level of analysis determines

whether any evidence should be excluded as a result of this constitutional

violation.  Neither party addressed in their brief this second half of the Fourth

Amendment equation.  However, in an effort to provide a complete decision to

the district court, this court will address the issue.

"The exclusionary rule has traditionally barred from trial physical,

tangible materials obtained either during or as a result of an unlawful

invasion."  Wong Sun, 371 U.S. at 485 (citing Silverman v. United States, 365

U.S. 505 (1961)).  The court must consider three factors to determine whether

the physical evidence found in the search of Mr. Little's person and his vehicle

was the fruit of the Fourth Amendment constitutional violation, or whether it

was obtained by "means sufficiently distinguishable to be purged of the

---

[7]In so holding, the court does not question Officer Twedt's *subjective* belief that Mr. Little had violated the law.  However, as explained above, the Eighth Circuit standard requires that Officer Twedt's mistaken belief be *objectively* reasonable, and that a *subjective* belief is not sufficient to satisfy the Fourth Amendment.  Martin, 411 F.3d at 1001.

primary taint." Wong Sun, 371 U.S. 487-88. Those three factors are: (1) the temporal proximity of the discovery of the evidence to the Fourth Amendment violation; (2) the existence of intervening causes between the violation and the discovery; and (3) the purpose or flagrancy of the official misconduct. Brown, 422 U.S. at 603-04. Of these factors, the purpose and flagrancy of police misconduct is "the most important factor because it is directly tied to the purpose of the exclusionary rule–deterring police misconduct." United States v. Simpson, 439 F.3d 490, 496 (8th Cir. 2006) (citing United States v. Reed, 349 F.3d 457, 464-65 (7th Cir. 2003)).

In the Wong Sun case, police violated the Fourth Amendment when they entered the residence of James Wah Toy and arrested him without probable cause. Id. at 473-75, 484-86. As a result of this constitutional violation, the Court applied the exclusionary rule to suppress statements Toy made while the officers were in his home illegally, and to suppress heroin obtained from Johnny Yee within one hour of the illegal arrest of Toy that derived from Toy's statements. Id. at 473-76, 485-88. The Court held that the circumstances did not show that the police discovered the heroin from an independent source, nor that the connection between the constitutional violation and the discovery of the heroin had "become so attenuated as to dissipate the taint" of the constitutional violation. Id. at 487. Rather, the Court held that the heroin was

obtained through exploitation of the original Fourth Amendment violation.  Id. at 488.

In United States v. Guevara-Martinez, 262 F.3d 751, 752 (8th Cir. 2001), Guevara-Martinez was subject to an illegal traffic stop and detention, during which methamphetamine was discovered.   He was then arrested and his fingerprints were taken.  Id.  Although indicted on drug charges, those charges were dismissed when the district court granted defendant's motion to suppress. Id.  Guevara-Martinez was then indicted on immigration offenses which came to light as a result of the police having taken his fingerprints.  Id.  The Eighth Circuit held that the fingerprint evidence should be suppressed because, although police did not arrest Guevara-Martinez for the sole purpose of obtaining his fingerprints, nevertheless the fingerprints were obtained "by exploitation" of the primary illegality–the illegal traffic stop, detention, and arrest–and nothing had intervened which would "purge the primary taint" of that constitutional violation.  Id. at 755-756 (citing Wong Sun, 371 U.S. at 488).  The court held that "[e]vidence can be obtained 'by exploitation' of an unlawful detention even when the detention is not for the sole purpose of gathering that evidence."  Id. at 755.

In United States v. Peralez, 526 F.3d 1115 (8th Cir. 2008), the Eighth Circuit held that physical evidence obtained from a vehicle that had been unlawfully detained need not be suppressed unless the constitutional violation

28

was "at least a but-for cause of obtaining the evidence." Id. at 1121. The initial reason for the traffic stop in Peralez satisfied the Fourth Amendment, but the prolonged detention of the defendant after the stop did not. Id. at 1119-21. In that case, the trooper had indicated to the defendants that he was going to run his drug dog around the car no matter what the defendants' responses to the trooper's questions were. Id. (stating that the trooper said "when" I run my drug dog around your car rather than "if"). Therefore, the court held that because the trooper was going to run his dog around the defendants' car anyway, the extended detention was not the cause of the search and the finding of evidence. Id. In other words, the court held that the evidence would have been discovered by the trooper even absent the constitutional violation. Id. Under such circumstances, the exclusionary rule does not apply. Id.

The same cannot be said here. As shown on Exhibit 1, a video recording of the traffic stop in this case, Officer Twedt's search of Mr. Little's person occurs nearly immediately after the traffic stop. See Exhibit 1. Both vehicles come to a stop at 16:10:38. Id. Officer Twedt conducts a bodily pat-down search of Mr. Little outside his vehicle, including reaching into his pants pockets, at 16:11:55, less than two minutes after the vehicles have rolled to a stop. Id. The search of Mr. Little's vehicle begins at 16:17:39, seven minutes after the traffic stop began. Id. There was no separation between the Fourth

Amendment violation–the traffic stop–and the searches of Mr. Little and the vehicle in which he was traveling. There is no indication that the evidence would ever have been discovered absent the Fourth Amendment violation. Accordingly, the court concludes that the taint of the Fourth Amendment violation had not been purged and any evidence deriving from the traffic stop must be suppressed. Wong Sun, 371 U.S. at 488; Guevara-Martinez, 262 F.3d at 755-56.

A suspect's giving of voluntary consent to search has sometimes been found to purge the taint of an illegal detention. See United States v. Lyton, 161 F.3d 1168, 1171 n.3 (8th Cir. 1998); Ramos, 42 F.3d at 1164. However, here, the evidence is not clear that Officer Twedt obtained Mr. Little's consent to search. No testimony was adduced at the hearing regarding this issue and the audio on the recording of the traffic stop is not clear during this exchange between Mr. Little and Officer Twedt. It is the government's burden to prove that an exception to the warrant requirement exists and applies. See United States v. Reidesel, 987 F.2d 1383, 1388 (8th Cir. 1993) (stating that "[w]hen the government seeks to introduce evidence that was seized during a warrantless search, it bears the burden of showing the need for an exemption from the warrant requirement and that its conduct fell within the bounds of the exception."). Since the government introduced no evidence regarding the

consent exception to the warrant requirement, the court recommends granting Mr. Little's motion to suppress.

## CONCLUSION

For the foregoing reasons, the court recommends that defendant Jason Little's motion to suppress [Docket No. 20,] be granted.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained. See Fed. R. Crim. P. 59(b); 28 U.S.C. § 636(b)(1)(B). Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Id. Objections must be timely and specific in order to require *de novo* review by the district court. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated February 3, 2010.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE